UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MARY WATSON,                    )
                               )
            Plaintiff,          )
                               )
        v.                      )          No. 4:08 CV 518 RWS
                               )                          DDN
                               )
 MICHAEL J. ASTRUE,            )
Commissioner of Social Security, )
                               )
            Defendant.          )

**REPORT AND RECOMMENDATION OF**
**UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final
decision of the defendant Commissioner of Social Security denying the
application of plaintiff Mary Watson for disability insurance benefits
under Title II of the Social Security Act, 42 U.S.C. § 401, <u>et seq.</u>  The
action was assigned to the undersigned United States Magistrate Judge
for review and a recommended disposition under 28 U.S.C. § 636(b).  For
the reasons set forth below, the undersigned recommends that the ALJ's
decision be affirmed.

**I.  BACKGROUND**

Plaintiff Mary Watson was born on June 29, 1960.  (Tr. 7.)  She is
5'2" tall with a weight that has ranged from 135 pounds to 150 pounds.
(Tr. 92, 390.)  She is married and has three children.  (Tr. 390.)  She
completed high school, three years of college, and completed nursing
school at Barnes-Jewish Hospital.  (Tr. 99.)  She last worked as a nurse
for Barnes-Jewish Hospital.  (Tr. 30.)

On November 21, 2005, Watson applied for disability insurance
benefits, alleging she became disabled on October 15, 2003, on account
of fibromyalgia, arthritis, hypothyroidism, asthma, depression, restless
leg syndrome, spine surgery for a herniated disk, bunion surgery,
migraines, gastroesophageal reflux disease (GERD), hernias, and

inflammatory polyarthropathies.[1]  (Tr. 44, 79, 93.)  She received a
notice of disapproved claims on April 18, 2006.  (Tr. 50-54.)  After a
hearing on March 28, 2007, the ALJ denied benefits on August 14, 2007.
(Tr. 14-23, 27-43.)  On March 24, 2008, the Appeals Council denied
plaintiff's request for review, making the ALJ's decision the final
decision of the Commissioner.  (Tr. 2-4.)


## II.  MEDICAL HISTORY

On an unknown date, Watson completed a disability report.  She
noted suffering from fibromyalgia, arthritis, hypothyroidism, asthma,
depression, restless leg syndrome, a herniated disk, hernias, bunions,
migraines, and GERD.  She also complained of fatigue, and pain in her
neck, back, knees, head, feet, ankles, and wrists.  She could not sit,
stand, or walk for extended periods before feeling the pain.  Watson
stopped working on October 15, 2003, on account of the pain and fatigue.
She was no longer able to lift patients and perform her duties as a
nurse.  From 1990 to 2003, Watson worked as a registered nurse on the
delivery floor at Barnes-Jewish Hospital.  As part of the job, she
frequently lifted fifty pounds or more.  Among her medications, Watson
took Allegra and Rhinocort for sinusitis, Ambien for sleep, Cymbalta for
depression, Darvocet, Glucosomine, and Neurontin for pain, Famotidine
for GERD and stomach problems, Relafen as an anti-inflammatory, Skelaxin
for muscle spasms, Synthroid for hypothyroidism, and used an Albuterol
inhaler, a Flovent inhaler, and Tessalon pearls for asthma.  Cymbalta

---

[1]Fibromyalgia is a condition that causes fatigue, muscle pain, and
"tender points."  Tender points are places on the neck, shoulders, back,
hips, arms, or legs that hurt when touched.  Fibromyalgia is also
associated with difficulty sleeping, morning stiffness, headaches, and
problems with thinking and memory.  Medline Plus, National Institutes
of Health, http://www.nlm.nih.gov/medlineplus/fibromyalgia.html (last
visited June 15, 2009).
Hypothyroidism is the diminished production of thyroid hormone,
leading to thyroid insufficiency, which is characterized by a low
metabolic rate, a tendency to gain weight, a strong desire for sleep,
and sometimes myxedema, a skin disorder.  Stedman's Medical Dictionary,
755, 1020 (25th ed., Williams & Wilkins 1990).  A hernia is the
protrusion of a part or structure through the tissues normally
containing it.  Id., 707.  Arthropathy is any disease affecting a joint.
Id., 136.

and Synthroid caused fatigue, Famotidine caused heartburn, and Relafen caused upset stomach. (Tr. 92-100.)

On an unknown date, Watson completed a disability report appeal. Her back pain had gotten worse since her last disability report. She could barely walk at times and had pain and numbness in her lower right foot and leg. She was losing her balance inexplicably, her hands became numb, and she had tingling in her right upper arm and shoulder. Among her medications, Watson took Aciphex for stomach problems, Effexor for depression, Allegra, Ambien, Darvocet, Glucosomine, Neurontin, Rhinocort Nasal Spray for sinusitis, Skelaxin, Synthroid, and used an Albuterol inhaler, a Flovent inhaler, and Tessalon pearls. Synthroid caused fatigue. Indeed, Watson complained of becoming fatigued easily. Most days it hurt to walk and sit. Watson would sometimes split the pain pills because she did not like feeling "under the influence." (Tr. 134-42.)

On January 2, 2002, Watson saw Deborah Parks, M.D. She was six months pregnant, and had been on disability for her pregnancy since almost her first trimester because she was getting dyspeptic with exertion.[2] (Tr. 297.)

On August 21, 2002, Watson saw Dr. Parks. Watson had given birth on May 6, and was having some trouble with post-partum depression. Her asthma had been good, and she had not needed any inhalers. Dr. Parks diagnosed her with keratosis, depression, though she was doing well, asthma that was stable, and carpal tunnel syndrome.[3] (Tr. 296.)

On March 6, 2003, Watson saw Dr. Parks for an asthma flare-up. A chest x-ray was unremarkable, and showed no active cardiac or pulmonary disease. Dr. Parks attributed the asthma flare-up to environmental factors, and increased her Flovent. She also recommended Watson modify her environment. (Tr. 291-93, 309.)

On March 13, 2003, Mandar Pattekar, M.D., reviewed an x-ray of Watson's esophagus. The x-ray showed no signs of narrowing or masses.

---

[2]Dyspnea is shortness of breath, usually associated with disease of the heart or lungs. Stedman's Medical Dictionary, 480.

[3]Keratosis is any lesion on the skin marked by the presence of circumscribed overgrowth. Stedman's Medical Dictionary, 823.

There was a small hernia. The x-ray was in response to Watson's diagnosed GERD and difficulty swallowing. (Tr. 273.)

On September 20, 2003, an x-ray of the chest was normal and showed no evidence of any acute disease. The lungs were clear and without focal infiltrates or consolidation. (Tr. 271.)

On November 4, 2003, an MRI of Watson's cervical spine revealed no disk abnormalities at C2-3, C3-4, C4-5, C5-6, and C7-T1.[4] The disk at C6-7 showed slight degradation and evidence of disk herniation. (Tr. 269-70.)

On December 10, 2003, Watson saw Dr. Parks complaining of terrific pain, and difficulties turning her head and raising her arm above her head. Muscle relaxants had been ineffective. Watson thought she was going to drop her 6-pound baby after holding him for five minutes. A physical examination showed Watson was extremely uncomfortable and could not make lateral turns. She could passively abduct her arms to 90 degrees, but doing so against resistance provoked pain. Dr. Parks suggested Watson see Dr. Dan Riew, an orthopedic surgeon, since she was not responding to conservative treatment. (Tr. 289-90.)

On January 2, 2004, Watson saw Dr. Parks, complaining of galactorrhea in both breasts.[5] Watson reported improvement in her neck pain and dysesthesias, but the pain was still severe enough that she was taking Darvocet, Ibuprofen, and Neurontin.[6] Watson reported not being

---

[4]The human spinal column consists of thirty-three vertebrae. There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx). The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back. The sacrum is immediately below the lumbar vertebrae. Stedman's Medical Dictionary, 226, 831, 1376, 1549, 1710, Plate 2.

[5]Galactorrhea is continued discharge of milk from the breasts between intervals of nursing. Stedman's Medical Dictionary, 628.

[6]Dysesthesia is an impairment of sensation, short of anesthesia. It also refers to a condition in which disagreeable sensation is produced by ordinary stimuli. Stedman's Medical Dictionary, 476. Ibuprofen, or Motrin, is an anti-inflammatory drug used to relieve pain
(continued...)

- 4 -

able to lift a spatula recently because of weakness in her right arm. Dr. Parks diagnosed her with glactorrhea and disk herniation at C6-7. (Tr. 289, 287.)

On January 7, 2004, Watson participated in physical therapy. She complained of tingling in her hands and upper extremities. Karen Seaton, PT, found that Watson was tolerating her medication well, and showed some improvement in her range of motion. Her body language, however, indicated she was in significant pain. Watson sat with eyes closed and heavy breathing. (Tr. 210.)

On January 14, 2004, Watson participated in physical therapy. She reported the pain level being 6/10 or 7/10. After physical therapy the pain level dropped to 3/10, but the reduction did not last long. Watson complained of upper extremity symptoms after trying to clean drawers. Watson was tolerating prescriptions well, but was unable to advance through the exercise program because of her increased pain level and acute condition. (Tr. 208.)

On January 15, 2004, Watson saw Dr. Riew for the first time. Her chief complaints were neck pain and bilateral arm pain since September 2003. Watson was unable to carry her 20-month old daughter for prolonged periods because of the pain. To date, Watson had undergone a conservative course of treatment: physical therapy, massage and ultrasound, and anti-inflammatory medications. A physical examination showed Watson was "in obvious discomfort." She was wearing a soft collar around her neck because of the pain, and was reluctant to move her neck. Her neck pain was worse with flexion. Dr. Riew diagnosed Watson with altered sensation in some of her fingers and forearm, and a right arm smaller than her left arm. Her reflexes were normal. X-rays showed minimal spondylosis and degenerative disk disease at C6-7.[7]

---

[6](...continued)
and swelling. WebMD, http://www.webmd.com/drugs (last visited June 15, 2009).

[7]Spondylosis is the stiffening or fixation of the joints within the vertebra. Stedman's Medical Dictionary, 1456.

There was also mild spurring at C4-5, C5-6, and C7-T1.[8]  Dr. Riew diagnosed her with a herniated nucleus pulposus causing axial neck pain, right-sided radiculopathy, and hyperesthesia around C7.[9]  She had failed two epidural steroid injections at C7-T1.  Watson wanted to try surgery, but Dr. Riew suggested one last epidural injection at C6-7.  (Tr. 232-33, 241.)

On January 19, 2004, Watson participated in physical therapy.  She was scheduled to have surgery in February.  (Tr. 207.)

On January 27, 2004, doctors reviewed a CT scan of Watson's cervical spine.  The CT scan revealed normal disk configuration at C2-3, C3-4, C4-5, C5-6, and C7-T1.  There was no spinal canal or neural foraminal stenosis.[10]  There was an osteophyte complex at C6-7, but no neural foraminal narrowing.  The facet joints were normal.[11]  (Tr. 255.)

On February 17, 2004, Watson saw Dr. Riew complaining of severe right arm pain and neck pain.  A physical examination revealed she had full flexion and grip strength.  She had paresthesias over the middle finger, but otherwise, was neurologically intact.[12]  X-rays showed mild spondylosis and a herniated disk at C6-7, causing radiculopathy.  Dr.

---

[8]A spur, or calcar, is a small projection from a bone.  Stedman's Medical Dictionary, 227.

[9]A herniated nucleus pulposus is a slipped disk along the spinal cord.  The condition occurs when all or part of the soft center of a spinal disk is forced through a weakened part of the disk.  University of Maryland Medical Center, http://www.umm.edu/ency/article/000442.htm (last visited June 16, 2009).  Radiculopathy is a disease of the spinal nerve roots.  Stedman's Medical Dictionary, 1308.  Hyperesthesia is abnormal sensitivity to touch, pain, or other stimuli.  Id., 739.

[10]The neural foramen is the space through which nerve roots exit the spinal canal to form peripheral nerves.  Each foramen is a bony canal formed by the pedicles of two adjacent vertebrae.  Medcyclopaedia, http://www.medcyclopaedia.com/?tt_topic=. (last visited June 16, 2009).  Stenosis is the narrowing or constriction of any canal.  Stedman's Medical Dictionary, 1473.  Spinal stenosis refers to the narrowing of the spinal cord.  See id.

[11]The facet joints are small stabilizing joints located between and behind adjacent vertebrae.  See Stedman's Medical Dictionary, 556.

[12]Paresthesia is an abnormal sensation, such as burning, pricking, or tingling.  Stedman's Medical Dictionary, 1140.

Riew would proceed with the artificial disk replacement at C6-7. (Tr. 229.)  Chest x-rays showed the lungs were clear, with no evidence of pulmonary masses. (Tr. 253.)

On February 25, 2004, Watson underwent an anterior cervical arthroplasty with an artificial disk replacement.[13]  She was diagnosed with a herniated nucleus pulposus and cervical spondylosis with radiculopathy at C6-7.  There were no complications. (Tr. 234-35.)  The next day, an x-ray of her cervical spine showed arthroplasty at C6-7, and mild soft tissue swelling consistent with recent surgery. (Tr. 250.)

On March 4, 2004, Watson saw Dr. Riew, complaining of nausea, vomiting, and constipation following cervical disk arthroplasty.  A physical examination showed Tinel's sign over the left calf.[14]  Her motor strength was normal, and she was able to heel walk, though there was a slightly altered sensation in her foot.  Dr. Riew believed her foot problems would resolve. (Tr. 228.)

On March 25, 2004, Watson saw Dr. Parks.  Watson's radicular symptoms from her herniated disk had improved since the surgery.  Yet, she had some burning dysesthesias in her left foot, and another episode of spontaneous galactorrhea.  She was off all of her medications except for Synthroid and Vioxx.[15]  Dr. Parks diagnosed Watson with an oral ulceration (for which she recommended Mylanta), galactorrhea, and dysesthesias of the left foot, which Dr. Parks attributed to positioning during anesthesia. (Tr. 288.)

On April 8, 2004, Watson saw Dr. Riew.  A physical examination showed Watson had some altered sensation to light touch, but otherwise,

---

[13]An arthroplasty is an operation to restore, as far as possible, the integrity and functional power of a joint.  Stedman's Medical Dictionary, 136.

[14]Tinel's sign is a sensation of tingling, or of "pins and needles," felt in the distal extremity of a limb, when percussion is made over the site of an injured nerve.  Stedman's Medical Dictionary, 1422.

[15]Vioxx was used to treat arthritis pain, but is no longer prescribed.  WebMD, http://www.webmd.com/drugs (last visited June 16, 2009).

had normal sensory motor reflexes.  An x-ray showed the arthroplasty in good position.  Dr. Riew found Watson had excellent motion and good alignment.  (Tr. 227)  That same day, an x-ray of Watson's cervical spine showed no signs of fracture or spondylolisthesis.[16]  (Tr. 240.)

On May 20, 2004, Watson saw Dr. Riew, three-months after her disk arthroplasty.  Watson still complained of shoulder pain, but described it as discomfort.  She still experienced some numbness and tingling in her arms, but it was intermittent.  A physical examination showed Watson had normal motor strength and normal reflexes.  X-rays showed the artificial disk in good position.  Dr. Riew diagnosed her with some neck pain and mild recurrent radicular symptoms that were intermittent.  He recommended aerobic exercise and a three-month follow-up.  (Tr. 225-26.)  An x-ray of the cervical spine showed straightening of normal cervical lordosis, and disk prosthesis at C6-7, without any abnormal motion with flexion, extension, and lateral bending.[17]  (Tr. 239.)

On June 29, 2004, Watson participated in physical therapy.  She reported feeling okay.  On the previous Sunday she had bad pain, but the day before that she had held her young daughter at church for about a half-hour.  (Tr. 199.)

On July 1, 2004, Judy Woehrle, PT, informed Dr. Riew that Watson had shown improved range of motion in her cervical spine, but continued to have pain with elevation of the upper extremities, particularly in both shoulders and in her right arm.  Watson expressed a desire to be able to use her arms for reaching, carrying, and lifting.  (Tr. 159.)

On August 3, 2004, a note from Judy Woehrle to Dr. Riew indicated Watson missed a few appointments in July because she had gone on vacation.  (Tr. 158.)

---

[16]Spondylolisthesis is the forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum. Stedman's Medical Dictionary, 1456.

[17]Lordosis is an abnormal extension deformity – usually in the form of a backward curvature of the spine.  Stedman's Medical Dictionary, 894.

On April 5, 2005, an MRI of Watson's cervical spine revealed normal motion at C6-7 (the location of the prosthetic disk), and minimal degenerative disk disease at C5-6. (Tr. 237.)

On August 19, 2004, Watson told Seaton that she was much better, and had recently been able to carry/hold her sleeping, thirty-pound baby for a short walk through a store. This was a big improvement. (Tr. 188.)

On September 2, 2004, Watson participated in physical therapy. She thought she had turned a corner. She had not taken her pain medication for the day, and was only having minimal soreness. She had also been working hard on her exercises. She still complained of tingling in her hands when her arms were overhead. Seaton observed that Watson's posture was noticeably better and that she was moving more freely. (Tr. 184.)

On September 7, 2004, Watson saw Dr. Riew. Her neck pain had improved significantly, and she was able to pick up her baby. She reported a sharp pain between the shoulder blades, which lasted for about fifteen minutes. This sensation happened four times over the last month, but did not get worse with activity, and spontaneously resolved. A physical examination revealed she was positive for Tinel's sign, but otherwise, a motor reflex exam and sensory exam were normal. X-rays showed the Bryan disk in good position, and she had excellent motion. Dr. Riew found Watson was doing better with better incorporation of the artificial disk. He noted cubital and carpal tunnel syndrome. Finally, he did not believe Watson's chest pain was back-related. But even if it was, "the symptoms sound too benign to do anything about it at this time." (Tr. 223-24.) That same day, an x-ray of the cervical spine showed normal motion at C6-7 with flexion and extension. (Tr. 238.)

On September 9, 2004, Watson participated in physical therapy. She noted an increase in symptoms following her last physical therapy session. Still, Watson indicated that Dr. Riew was pleased with her progress. After therapy, Watson reported an episode of protracted weakness. Jennifer Hirsch, PT, urged her to seek medical treatment. (Tr. 182-83.)

On September 10, 2004, Watson saw Dr. Parks, complaining of increasing back pain and chest pain at night. She almost went to the emergency room because the chest pain was so severe. A physical examination showed her lungs were clear, her heart had no murmurs, and she had no peripheral swelling. Her upper abdomen was tender. An EKG showed no acute changes. Dr. Parks diagnosed chest pain and back pain, likely gastrointestinal in origin. Dr. Parks thought Watson might need therapy for her depression. (Tr. 286.)

On September 20, 2004, Watson told Jennifer Hirsch that she was "definitely better," and felt like her strength was improving and she was able to do most of her exercises. Hirsch discussed with Watson the idea of taking a break from physical therapy when her current prescription expired. Watson was a little concerned about ending physical therapy. (Tr. 180.)

On September 27, 2004, Watson participated in physical therapy. She complained of pain and tingling in the upper thoracic region, particularly when performing her exercises. (Tr. 178.) That same day, Jennifer Hirsch wrote to Dr. Riew, noting that Watson had been attending physical therapy twice a week, with slow but steady progress. Hirsch asked Dr. Riew to sign a prescription if the doctor approved of more visits. (Tr. 155.)

On October 19, 2004, Watson saw Dr. Parks. She was feeling less depressed, and no longer having crying episodes. She was still having increasing arthralgias, predominantly in the joints.[18] Dr. Parks diagnosed her with arthralgias, GERD, and improved radicular pain. (Tr. 285.)

On October 25, 2004, a physical therapy note indicated Watson still sighed, from pain, during exercises. Still, Jennifer Hirsch felt as if Watson had met her maximum potential with physical therapy. (Tr. 169.)

On October 28, 2004, Seaton completed an upper extremity progress note. Watson suffered from myofacial pain with radicular symptoms. From June 10, 2004, until October 28, Watson had visited physical therapy twenty-five times. According to the note, Watson did not

_____

[18]Arthralgia is severe joint pain, but not inflammatory. <u>Stedman's Medical Dictionary</u>, 134.

experience pain every day.  But when she did, evenings were the worst.
The pain was 5/10 at its worst, and 1/10 at its best.  She felt
comfortable with her exercises and felt she could follow up at home.
Her posture showed slight improvement in lower cervical flexion.  Her
upper extremity strength was 4/5 or 5/5 in all major groups.  She showed
signs of intermittent tenderness adjacent to the cervical spine.  In her
assessment, Seaton thought Watson had "achieved all goals."  She
instructed her to stop exercising for one to two weeks, then to resume
at half-intensity in an attempt to further reduce pain.  Watson was "to
continue her daily activity level as normal," and could discontinue
physical therapy.  (Tr. 167.)

On April 4, 2005, Watson saw Dr. Riew.  She noted her neck pain
continued to improve, but that she still had some pain at the base.
There was no radiating pain.  A physical examination showed Watson had
minimally altered sensation to pinprick in the thumb and index finger,
but otherwise, sensation was normal.  She had normal motor strength and
normal reflexes.  Dr. Riew recommended aerobic exercise.  (Tr. 222.)

On May 26, 2005, Watson saw Dr. Park complaining of depression.
Watson was sleeping well, and Cymbalta was helping with her aches.  (Tr.
283.)

On May 31, 2005, Watson had swelling around her kneecap.  A
physical examination showed some erythema with some soft tissue
thickening of the bursa, but no effusion in the knee itself.[19]  She
maintained good range of motion.  Dr. Parks prescribed Advil,
Triamcinolone cream, and Cephalexin.[20]  (Tr. 283.)

---

[19]Erythema is inflammatory redness of the skin.  Stedman's Medical
Dictionary, 533.  Effusion is the escape of fluid from the blood vessels
into the tissues or into a cavity.  Id., 491.

[20]Triamcinolone cream is used to treat a variety of skin
conditions, such as rashes and eczema.  Cephalexin is an antibiotic used
to treat a variety of infections.  WebMD, http://www.webmd.com/drugs
(last visited June 16, 2009).

On June 2, 2005, Dr. Parks found Watson's cellulitis overlying the patella to be "dramatically better."[21]  Her erythema was the size of a dime.  (Tr. 282.)

On June 28, 2005, Gary M. Wassermann, M.D., conducted a bone mineral density study.  The study showed Watson had a normal density in the lumbar spine, left femoral neck, and left hip bone.  (Tr. 303.)

On October 3, 2005, Watson saw Dr. Parks, complaining of knee and hip pain.  She had trouble walking and was exhausted.  Her mood was low.  A physical examination showed significant crepitus in the knee, with pain around the femur.  Dr. Parks diagnosed her with fibromyalgia and true osteoarthritis.  She wanted Watson to reduce her Darvocet.  Dr. Parks scheduled physical therapy, and recommended a follow-up in six weeks.  (Tr. 281.)

On November 14, 2005, Watson saw Dr. Parks, complaining of hip and knee pain.  Watson was unable to tolerate the Relafen because of worsening GERD.  She was feeling very depressed.  Dr. Parks found marked crepitus in her left knee.[22]  She suggested physical therapy for the knee, and Effexor for her depression.  (Tr. 280.)  That same day, David A. Rubin, M.D., reviewed an x-ray of Watson's left knee.  Knee alignment was anatomic; there were no fractures or dislocations, there was no effusion, and the joints were normal.  (Tr. 236.)

On December 1, 2005, Watson participated in physical therapy.  Watson's diagnosis was fibromyalgia, with an onset date of six months earlier.  Her rehabilitation potential was marked as "good."  Her work status was marked as "retired."  Watson also complained of hip pain, tailbone pain, and left knee pain dating back six months, with the pain getting worse all the time.  Watson reported pain with all activities, and fatigue after walking for thirty to sixty minutes.  Monica Nicastro, MSPT, noted Watson had good rehabilitation potential, but found Watson reported "pain with all movements."  (Tr. 376.)

---

[21]Cellulitis is inflammation of cellular or connective tissue. Stedman's Medical Dictionary, 273.

[22]Crepitus, or crepitation, refers to crackling, and can be the noise or vibration produced by rubbing bone or irregular cartilage surfaces together.  Stedman's Medical Dictionary, 368.

On January 17, 2006, Watson participated in physical therapy. To date, she had participated in 10 of 13 scheduled appointments. Nicastro noted Watson's motivation was fair. Her work status was marked as "retired." (Tr. 375.)

On February 10, 2006, Watson completed a function report. In a typical day, Watson played card games with her toddler and made simple meals. She might make her kids a snack when they got home from school. She tried to rest during the day. At night, she made dinner, and helped her 3-year old shower and get ready for bed. By this point she was "totally exhausted." The rest of the day, she might do passive exercises or take her children with her to go grocery shopping. If needed, she might do the laundry. Watson took care of her husband and her toddler, but noted that her other two children, a 14-year old and 12-year old, helped out a lot, finishing what she tried to start. (Tr. 101-102, 108.)

Before her illness, Watson was able to do whatever she wanted, from working on the delivery floor, to painting, to holding her children while vacuuming. Now, she was lucky to be able to wash the dishes without having to stop. Her impairments affected her ability to dress and shower. Bending was difficult and showering left her exhausted. Watson used to cook real meals, but lately had just been preparing frozen foods and pre-packaged meals. Watson's children helped her do laundry. Cleaning a single room could take all day. She was able to drive a car, but after an hour, her back and hips hurt. If she went grocery shopping, she preferred to go with her children, so they could help her lift any groceries. Watson like to embroider and do crafts, but it took a lot of energy and concentration. She used to volunteer at her children's school and attend sports activities, but was no longer able to do so. She only went places she had to go - like to school, to the doctor's office, or to physical therapy. (Tr. 102-06.)

Watson's impairment made it difficult to lift, squat, bend, stand, walk, sit, kneel, climb stairs, remember things, complete tasks, concentrate, follow instructions, use her hands, and get along with others. She could only lift a gallon of milk if she used both hands.

She could sometimes pick up her daughter, but could not hold her. Watson did not handle stress well. (Tr. 106-09.)

On February 14, 2006, Watson saw Dr. Riew, complaining of neck pain and total body pain from fibromyalgia. A physical examination showed normal sensory, motor, and reflexes, except in the thumb and forefinger, and a normal gait other than slow walking from fibromyalgia. Dr. Riew's review of the x-rays showed good incorporation of the artificial disk and excellent preservation of motion and alignment. Dr. Riew scheduled a follow-up in a year's time. (Tr. 463.)

On February 28, 2006, Watson saw Dr. Parks for a follow-up of her depression. She had trouble standing and sitting for long periods, and had migratory joint pain. Dr. Parks diagnosed her with chronic lower back pain and hip pain, with the possibility of some underlying degenerative disk disease. (Tr. 455.) An MRI of the lumbar spine revealed multi-level lumbar degenerative disk disease. (Tr. 460.)

On March 16, 2006, Watson completed her physical therapy. She had attended 20 of 29 scheduled appointments. Monica Nicastro indicated Watson's motivation was fair. Her work status was marked as "not working." Watson reported her endurance was better, but that she still got weak and tired doing certain things. Her pain was about the same, and she still had nausea. Nicastro noted Watson had partially met her goals. She was able to lift her daughter with less pain and could walk on a treadmill for seven minutes, but her pain level for daily activities remained the same. Because of her poor tolerance for exercise, Nicastro recommended Watson try aquatic therapy. (Tr. 357.)

On March 21, 2006, Watson went to the emergency room, complaining of chest pain. Moderate to heavy exertion produced the pain, which was moderate to severe. A physical examination showed Watson was anxious and wheezing. However, her chest was non-tender and she was in no respiratory distress. Her condition was improved on re-examination. She was diagnosed with asthma, acute bronchitis, and chest pain. (Tr. 327-38.) Dr. Elizabeth McFarland found no acute cardiopulmonary changes during her examination. The lungs were clear, there were no pleural effusions, and the thoracic spine and bony structures were intact. (Doc. 339.)

On March 23, 2006, Watson completed a functional health status summary. As part of the summary, she indicated having "[q]uite a bit of difficulty" walking two blocks and doing her usual housework. Her health limited her ability to walk more than a mile. In the report, Watson reported pain all over her body - in her hips, shoulders, arms, neck, ankles, knees, and right foot. (Tr. 353-56.)

On March 31, 2006, Watson participated in range of motion testing. Her grip strength, lower extremity muscle weakness, and upper extremity strength were 4/5. Her effort was good for each. (Tr. 387-88.) That same day, Andrew Wayne, M.D., a doctor of physical medicine and rehabilitation, wrote to the Missouri Department of Disability Determinations. Watson told Dr. Wayne she had mild difficulty with prolonged driving, and difficulty with prolonged standing and walking. A physical examination showed Watson had a slow gait with a bilateral antalgic pattern. She also rocked "back and forth constantly while sitting down." She had decreased sensation in her left leg, left foot, right foot, and fingertips. She had typical fibromyalgia tender points. Straight leg raises were mildly positive for lower back pain and she had moderate restriction of motion in her shoulders and lower back. She had normal motion in the elbows and forearms. She did not appear to have any difficulty breathing. Dr. Wayne diagnosed Watson with fibromyalgia, osteoarthritis in the neck with disk replacement at C6-7, depression reasonably well-controlled with medication, asthma controlled with medication, and a history of migraines. Watson took Aciphex for her GERD and did "not describe her GI problems as being very severe." Synthroid seemed to be managing her thyroid function as well. In all, Dr. Wayne believed Watson's biggest functioning difficulty was from her fibromyalgia. Based on her fibromyalgia and other medical issues, Dr. Wayne would limit Watson to two hours of standing and/or walking in an eight-hour day. He did not believe she needed an assistive device. He thought she did not have any limitations for sitting or using her upper extremities for fine motor activities. He thought she could only lift ten pounds and drive no more than thirty minutes at a time. (Tr. 389-92.)

On April 7, 2006, Watson saw Allison Burner, M.A., a licensed psychologist, for a psychological evaluation. Watson was cooperative and had good eye contact during the exam. Her speech was clear and she denied any hallucinations. Her thought content was rational and organized, with no evidence of paranoia, phobias, obsessions, or other significant disorders. Watson reported needing help cooking, cleaning, grocery shopping, and doing laundry. She could not sit, stand, or lay down comfortably for any period of time. Burner found Watson had good concentration and persistence, but found her chronic pain had caused some anxiety and depression. Burner diagnosed her with adjustment disorder with mixed anxiety and a depressed mood, and assigned her a GAF score of 60.[23] (Tr. 395-98.)

On April 14, 2006, Judith A. McGee, Ph. D., completed a psychiatric review of Watson. Dr. McGee found Watson needed an RFC assessment, and had non-mental impairments that required referral. Dr. McGee found Watson had depression and adjustment disorder, with mild restriction of her daily activities, moderate difficulties maintaining concentration, but no difficulties maintaining social functioning. Watson had no episodes of extended decompensation. Dr. McGee found Watson's allegations of depression and difficulty concentrating because of her pain to be fully credible. She believed Watson retained the ability to perform simple work. (Tr. 399-416.)

On April 18, 2006, Angela Hickerson, a disability examiner, completed a physical residual functional capacity assessment. Hickerson found Watson could lift ten pounds occasionally, less than ten pounds frequently, stand and/or walk for about two hours in an eight-hour workday, sit for six hours in an eight-hour workday, and perform

---

[23]A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components. On the GAF scale, a score of 55 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed., American Psychiatric Association 2000).

unlimited pushing and pulling. She could only occasionally climb, crouch, and stoop, and had a limited ability to reach overhead. Because of asthma, she needed to avoid even moderate exposure to fumes, odors, dusts, and gases. Hickerson found Watson's fibromyalgia was well documented, and that she had the associated symptoms. But because her allegations were more restrictive than the totality of the evidence, Hickerson found her allegations only partially credible. (Tr. 417-24.)

On June 22, 2006, Michael E. Presti, M.D., performed an upper endoscopy and a colonoscopy, and took biopsy samples. After the procedures, he diagnosed Watson with a small hiatal hernia, but otherwise normal esophagus, mild gastritis, tethering of the colon, though without any obvious abnormalities of the colon, and internal hemorrhoids.[24] Dr. Presti advised Watson to continue with her acid-suppression medication for the gastritis and GERD. Dr. Presti also advised Watson to undergo a follow-up evaluation with an upper and lower endoscopy. (Tr. 444-49.)

On July 14, 2006, an MRI of the abdomen showed a tiny simple cyst in the liver, but otherwise, the liver was unremarkable. There was no mass, lesion, fluid collection, or abnormal enhancement in the abdomen. Biopsies of the small intestine, stomach, large intestine, and colon also showed no pathologies. (Tr. 442, 445, 452.)

On September 19, 2006, Robert K. Duddy, DPM, checked the boxes indicating Watson could sit, stand, and/or walk for six hours in an eight-hour workday. Dr. Duddy had successfully performed bunion surgery on Watson on July 19, 2005. (Tr. 426-27, 431-37.)

On October 13, 2006, Watson saw Dr. Parks, complaining of weakness in her lower extremities, feeling week, and being off balance. She also complained of dysesthesias and chronic headaches. A physical examination showed an antalgic gait, that Watson was hyperreflexic throughout, but had full strength in her upper extremities, and 5-/5

---

[24]A hiatal hernia forms at the opening in the diaphragm where the esophagus meets the stomach. Part of the stomach pushes through this opening causing a hiatal hernia. Most small hiatal hernias do not cause problems. MayoClinic.com, http://www.mayoclinic.com/health/hiatal-hernia/DS00099 (last visited June 16, 2009). Gastritis is inflammation of the stomach. Stedman's Medical Dictionary, 635.

strength in her lower extremities.[25]  Dr. Parks diagnosed Watson with lower extremity pain and weakness, likely due to lumbosacral disease. (Tr. 454.)

On October 16, 2006, doctors reviewed an MRI of Watson's lumbar spine.  The MRI revealed mild facet arthropathy at L2-3, L3-4, L4-5, and L5-S1, but no central stenosis at any level.  There were also signs of bulging, disk dessication, and loss of height at L2-3 and L3-4.[26]  The diagnosis was mild lumbar spondylosis.  (Tr. 458-59.)

On December 4, 2006, Watson saw Dr. Parks.  Watson had seen a neurologist recently, and the conclusion was that the vast majority of her issues stemmed from fibromyalgia.  Dr. Parks counseled Watson to seek "nonpharmacologic means of helping her pain levels."  Dr. Parks was going to send Watson back to physical therapy.  (Tr. 454, 456.)

From December 14, 2006, to January 30, 2007, Linda Medlock, M.Ed. LPC, saw Watson.  (Tr. 466.)  During the December 14 visit, Medlock noted Watson lived at home with her three children, and supervised the household.  She was able to drive, manage family finances, and perform light housework.  She attended church once month, but it was painful to sit.  Her general health was good other than fatigue.  Her hygiene was good, her family and peer relationships were good, and she did not have any suicidal thoughts.  Her appearance was good, her affect and mood were normal, and her speech was normal.  Her goals were to keep up with daily activities, to decrease her pain, and to be more functional. Medlock assigned Watson a GAF score of 50.[27]  (Tr. 470-77.)

On February 28, 2007, Watson saw Christine Sigman, M.D., for a follow-up.  Her hypothyroidism had improved, but her fibromyalgia pain was worse.  At the time, she was taking Albuterol, Allegra, Ambien,

---

[25]Hyperreflexia is a condition in which the reflexes are exaggerated.  Stedman's Medical Dictionary, 745.

[26]Disk dessication is the drying out of the intervertebral disks. Stedman's Medical Dictionary, 422.

[27]On the GAF scale, a score of 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job).  Diagnostic and Statistical Manual of Mental Disorders, 32-34.

Atrovent Cytomel, Darvocet, Effexor, Neurontin, Nexium, Rhinocort, Skelaxin, Synthroid, and Vivelle.[28]  Dr. Sigman diagnosed Watson with hypothyroidism, menopausal and post-menopausal disorders, fibromyalgia, and disorders of the skin.  (Tr. 479-81.)

From December 11, 2006, to April 16, 2007, Watson participated in physical therapy at Rehab1Network.  (Tr. 497-529.)  A progress note from March 19, 2007, indicated Watson complained of back pain, with the pain increasing from any prolonged sitting or walking.  Barb Yemm, PT, observed that Watson's cervical and lumbar range of motion was within normal limits.  Her bilateral upper extremity strength tested at 4+/5, without any complaints of pain.  Yemm believed Watson continued to make progress with increasing exercise regimen.  She had two episodes of increased pain following increased activity, but overall continued to see decreasing frequency and intensity of pain.  (Tr. 512.)

On February 1, 2007, Watson's attorney, Donald Kohl, wrote to Dr. Parks, requesting she respond to a questionnaire "regarding the claimant's physical capacity to perform tasks necessary to work."  On March 26, 2007, Dr. Parks completed the questionnaire.  As part of her responses, she indicated Watson could only walk 200 feet before needing rest, sit for 2 hours continuously, stand 15 minutes continuously, and lift 10 pounds.  (Tr. 492-92.)

In September 2007, Watson completed a request for review of the ALJ's decision.  In the request, she noted that she was unable to sit, stand, or walk for even short periods without experiencing a lot of pain.  She noted problems with fatigue, headaches, and pain in her neck and back.  She had not carried her child since she was a small baby. She took naps because she could not help it; her fatigue was overwhelming.  (Tr. 8-9.)

---

[28]Atrovent, or Ipratropium, is a bronchodilator used to treat lung diseases like chronic bronchitis and emphysema.  Cytomel is used to treat hypothyroidism.  Nexium is used to treat acid-related stomach and throat problems, such as acid reflux or GERD.  Vivelle is a hormone used to reduce menopausal symptoms.  WebMD, http://www.webmd.com/drugs (last visited June 16, 2009.)

**Testimony at the Hearing**

On March 28, 2007, Watson testified before the ALJ. She had last worked as a registered nurse. She had not worked any other jobs within the last fifteen years. Watson believed her fibromyalgia was her worst impairment. The pain was worst in her lower back and neck, but was also present in both her knees. Her fatigue and depression were two other impairments that prevented her from working. Watson saw Dr. Parks and Linda Medlock for her depression. Dr. Parks prescribed medication, while Medlock served as her therapist. Watson called the depression overwhelming. She also suffered from hypothyroidism, which produced fatigue. Watson suffered from asthma, but she did not think the asthma kept her from working. Watson had GERD as well. Taking Ibuprofen to combat her aches and pains gave her serious stomach issues. She had stomach attacks nearly every day. (Tr. 27-33.)

In February 2004, Watson had received a disk replacement, but had not regained her strength following the procedure. Watson still experienced pain. On a good day, the pain was 3/10, and on a bad day, it was 7/10 or 8/10. On a bad day, Watson took Darvocet to relieve the pain. But taking the pain medication made her dizzy and made it hard to concentrate because she felt "high." She tried to avoid taking Darvocet because of its side effects. Watson would also lay down several times during a day to relieve the pain. She could not pick up a gallon of milk, because it would cause a lot of pain later on. She took her children with her to the grocery store because she needed the help. (Tr. 33-37.)

Her asthma did not keep her from working, but it did produce shortness of breath. Watson's depression caused her to get tearful, irritable, and short-tempered. Her GERD gave her stomach pain, made her pass gas, and belch. Her stomach issues happened every night, but Nexium helped. She could not sit for very long, and was unable to go to church for even an hour. Watson was able to sleep okay. (Tr. 37-39.)

During the hearing, Gary Weimholt testified as a vocational expert (VE). The ALJ had the VE assume that Watson could lift ten pounds occasionally, less than ten pounds frequently, sit for six hours in an

eight-hour workday, stand and/or walk for two hours in an eight-hour workday, and occasionally climb, balance, kneel, and crawl. The ALJ also had the VE limit overhead reaching and limit exposure to fumes. Finally, he was to assume Watson could understand, remember, and carry out simple instructions. Under these circumstances, the VE testified that Watson could not return to her nursing job. However, the VE believed Watson could perform some sedentary work - such as glassware and plastic assembly work (DOT # 739.687-066) or pharmaceutical packing jobs (DOT # 559.687-014). If Watson had to lay down for an hour, either once or twice a day, she would not be able to perform any work in the national economy. If Watson also had crying spells, the inability to maintain regular attendance, the inability to complete a workday without interruption from psychological symptoms, the inability to perform at a consistent pace, and the inability to deal with normal workday stress, the VE stated she would not be able to perform any work in the national economy. (Tr. 39-43.)

### III.  DECISION OF THE ALJ

The ALJ found that Watson suffered from degenerative disk disease, joint disease, fibromyalgia, and an adjustment disorder, and that these impairments were severe. The ALJ also found Watson suffered from migraine headaches, reflux disorder (GERD), asthma, and hypothyroidism, but that these impairments were not severe. Watson had worked for many years despite the asthma, her migraines were infrequent, and medication managed her reflux disorder and hypothyroidism. (Tr. 17-19.)

The ALJ found the medical evidence did not support a disability finding. Watson underwent disk replacement, but post-operative reports from Dr. Riew showed normal motor strength, normal reflexes, and mostly normal sensory ability. MRIs of Watson's lumbar spine showed only mild degeneration, and reports from Dr. Parks showed minimal left knee degeneration. Dr. Sigman found Watson had a normal gait, normal reflexes and neurological results were intact. Knee exams were largely unremarkable. Watson participated in physical therapy for her fibromyalgia, but a report from the therapist showed good improvement in ambulation, endurance, and trunk and lower extremity strength, and

an increased tolerance for daily activities. Dr. Wayne found Watson did not have any limitations in sitting or performing fine motor activities, and concluded Watson could lift up to ten pounds and stand and/or walk for two hours in an eight-hour workday. (Tr. 19-20.)

The ALJ discounted an opinion from Dr. Parks, which had stated that Watson could only stand fifteen minutes at a time. The ALJ found this conclusion was not supported by Dr. Parks's own treatment notes. The ALJ also discounted Watson's allegations of mental disability, because the medical record did not reveal any ongoing mental health treatment. In addition, Watson had told her treating physician and Dr. Wayne that her medication was effective. Psychiatric examinations by Dr. Sigman, Dr. McGee, and Alison Burner did not reveal any serious mental limitations. The ALJ gave almost no weight to the opinion of Linda Medlock. Medlock was a licensed professional counselor, and counselors are not considered medical sources. In addition, Medlock's mental status evaluation of Watson produced normal results. Finally, Watson had not undergone any episodes of decompensation. (Tr. 20.)

The ALJ found Watson not entirely credible. Watson cared for her three young children, and the ALJ found the ability to care for a young child inconsistent with allegations of a physical or mental disability. The ALJ also noted that Watson reported being able to lift her daughter, despite claiming she could not lift a gallon of milk. She told her physical therapist she was retired, not disabled. She claimed she could not sit for long periods of time, but reported driving, watching television, and reading. Watson complained of flightiness and difficulty concentrating, but she never told any doctors about these side effects. Watson said she needed to lay down during the day, but no doctor had told her this was necessary. (Tr. 20-21.)

The ALJ concluded Watson maintained the RFC to lift ten pounds occasionally, lift less than ten pounds frequently, sit for six hours in an eight-hour workday, stand and/or walk for two hours in an eight-hour workday, and occasionally crouch, kneel, crawl, and climb. She could not reach overhead on a repetitive basis, and needed to avoid fumes. Finally, the ALJ found Watson could understand and carry out simple instructions and non-detailed tasks. Watson was unable to

perform her past duties as a nurse. However, the vocational expert found Watson could perform work as a product assembler or packager. The ALJ found this credible evidence that Watson could perform other jobs in the national economy. Accordingly, the ALJ concluded Watson was not disabled within the meaning of the Social Security Act. (Tr. 20-23.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does

not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id. Step four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work. Id. The claimant bears the burden of demonstrating she is no longer able to return to her past relevant work. Id. If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at step five to show the claimant retains the RFC to perform other work. Id.

In this case, the Commissioner determined that Watson could not perform her past work, but that she maintained the RFC to perform other work in the national economy.

## V.  DISCUSSION

Watson argues the ALJ's decision is not supported by substantial evidence. First, she argues the ALJ failed to evaluate her mental impairment, and any resulting functional limitations. Second, she argues the ALJ failed to accord adequate weight to the opinion of Dr. Parks. Third, she argues the ALJ erred by failing to recontact her treating medical providers. Fourth, she argues the ALJ erred in discounting the opinion of Linda Medlock. (Doc. 6.)

**Mental Evaluation**

Watson argues the ALJ failed to evaluate her mental impairment.

Federal regulations provide special procedures for the Commissioner to follow in evaluating mental impairments. 20 C.F.R. § 404.1520a(a); Tilley v. Astrue, No. 4:07 CV 801 FRB, 2008 WL 4402219, at *13 (E.D. Mo. Sept. 24, 2008). First, the Commissioner must evaluate the claimant's pertinent symptoms, signs, and laboratory findings to determine whether the claimant has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b)(1). If the claimant has a medically determinable mental impairment, the ALJ must describe the symptoms, signs, and findings that substantiate the impairment. Id.

Second, the ALJ must characterize the severity of the mental impairment. 20 C.F.R. § 404.1520a(b)(2). The ALJ does this by rating the extent of the claimant's functional loss in the areas of: 1) daily

living, 2) social functioning, 3) concentration, persistence, or pace, and 4) episodes of decompensation.  20 C.F.R. § 404.1520a(c)(3).  If the claimant's functional loss in the first three areas is only mild, and there have been no episodes of decompensation, the ALJ will generally concluded that a claimant's mental impairment is not severe.  20 C.F.R. § 404.1520a(d)(1).  If the ALJ finds the impairment is severe, the ALJ must determine if the impairment meets a listed mental disorder.  20 C.F.R. § 404.1520a(d)(2).  If the ALJ finds the impairment is severe but does not meet a listed disorder, the ALJ performs an RFC assessment.  20 C.F.R. § 404.1520a(d)(3).  At the hearing stage, the ALJ must document the application of these procedures in the decision.  20 C.F.R. § 404.1520a(e).  If the ALJ fails to follow the appropriate procedure for evaluating the severity of a claimant's mental impairment, the decision must be remanded.  Tilley, 2008 WL 4402219, at *14.

In this case, the ALJ properly evaluated Watson's allegations of mental impairment.  In his opinion, the ALJ noted Watson had undergone psychological evaluations by Dr. Sigman, Allison Burner, and Judith McGee, and that these examinations were unremarkable and showed no significant mental limitations.  The ALJ also noted that one of Watson's GAF scores indicated only moderate symptoms.  Finally, the ALJ specifically found that Watson had no episodes of decompensation, no difficulties maintaining social functioning, no more than mild restrictions of daily living activities, and no more than moderate difficulties maintaining concentration, persistence or pace.  Under the circumstances, the ALJ properly followed the procedure for evaluating the severity of Watson's mental impairment.

More to the point, substantial evidence supports the ALJ's conclusion that Watson's mental impairments were not disabling.  In March 2006, Watson told Dr. Wayne that her depression was reasonably well-controlled with medication.  In April 2006, Allison Burner found Watson was rational and organized, with no evidence of any significant disorders.  That same month, Judith McGee concluded Watson had no episodes of extended decompensation.  In December 2006, Linda Medlock found Watson did not have any suicidal thoughts, was able to manage her finances and perform light housework, and had normal speech and affect.

There is no evidence in the record that Watson received aggressive mental health treatment, or that she was hospitalized for mental health reasons. She never voiced any suicidal thoughts, delusions, or hallucinations. After reviewing the medical record, substantial medical evidence supports the ALJ's determination that Watson's mental impairments were not disabling. See Jones v. Callahan, 122 F.3d 1148, 1153 (8th Cir. 1997) (ALJ properly concluded that claimant did not have a severe mental impairment, where claimant was not undergoing regular mental-health treatment or regularly taking psychiatric medications, and where his daily activities were not restricted from emotional causes).

**Weighing Medical Testimony**

Watson argues the ALJ failed to accord adequate weight to the opinion of Dr. Parks. She also argues the ALJ erred in discounting the opinion of Linda Medlock.

The ALJ has the role of resolving conflicts among the opinions of various treating and examining physicians. Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). The ALJ may reject the conclusions of any medical expert, whether hired by the government or the claimant, if they are inconsistent with the record as a whole. Id. Normally, the opinion of the treating physician is entitled to substantial weight. Casey v. Astrue, 503 F.3d 687, 691 (8th Cir. 2007). The opinion of a consulting physician, who examines a claimant once, or not at all, generally receives very little weight. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).

Still, the opinion of the treating physician is not conclusive in determining disability status, and must be supported by medically acceptable clinical or diagnostic data. Casey, 503 F.3d at 691. The ALJ may credit other medical evaluations over the opinion of a treating physician if the other assessments are supported by better or more thorough medical evidence, or when the treating physician's opinions are internally inconsistent. Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005); Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000). In determining how much weight to give a treating physician's opinion, the

ALJ must consider the length of the treatment relationship and the frequency of examinations. <u>Casey</u>, 503 F.3d at 692.

In March 2007, Dr. Parks provided her opinion about Watson's ability to perform certain tasks. However, the ALJ discounted this opinion, finding it was not supported by the doctor's own treatment notes. Substantial evidence supports the ALJ's decision to discount this opinion.

In March 2007, Dr. Parks completed a questionnaire, in which she indicated Watson could only walk 200 feet before needing rest, stand for 15 minutes at a time, sit for 2 hours at a time, and lift no more than ten pounds. However, there is no medical support or analysis behind these summary conclusions. <u>See</u> <u>Browning v. Sullivan</u>, 958 F.2d 817, 823 (8th Cir. 1992) (noting that a conclusory diagnosis letter does not overcome substantial evidence to the contrary). Indeed, Dr. Parks had not examined Watson within several months of completing the questionnaire. The questionnaire was completed in response to a letter from Watson's attorney, requesting that she "respond to the questions set forth on the attached Exhibit A. . . ." (Tr. 492.)

In contrast to this opinion, Dr. Parks found Watson had full strength in her upper extremities, and 5-/5 strength in her lower extremities during an exam in October 2006. Two months later, Dr. Parks counseled Watson to seek "nonpharmacologic means of helping her pain levels," and recommended more physical therapy. There is no evidence from prior visits that Dr. Parks ever found Watson had the type of limitations she indicated in the 2007 questionnaire.

In his opinion, the ALJ noted the inconsistencies between Dr. Parks's 2007 letter and her other treatment notes. Accordingly, the ALJ articulated a sufficient reason for discounting the opinions in the 2007 questionnaire. <u>See</u> <u>Guilliams</u>, 393 F.3d at 803; <u>Cantrell</u>, 231 F.3d at 1107.

The ALJ also discounted the opinion of Linda Medlock. In discounting her opinion, the ALJ noted that a counselor is not an acceptable medical source, her opinions were inconsistent with the record as a whole, and her opinions were internally inconsistent.

During the December 14 visit, Linda Medlock found Watson was in good general health, with a normal appearance, normal affect, and good hygiene. Her family and peer relationships were good, and she did not have any suicidal thoughts. Yet, Medlock assigned Watson a GAF score of 50, which represented serious symptoms (such as thoughts of suicide), or any serious impairment in social or occupational functioning (such as the inability to make friends or keep a job). Given the clear internal inconsistency between her findings and the GAF score, the ALJ did not err in discounting the opinion of Linda Medlock. See Guilliams, 393 F.3d at 803; Cantrell, 231 F.3d at 1107.

**Recontacting Physicians**

Watson argues the ALJ should have recontacted Watson's treating physician if he found the records were inconsistent.

A social security hearing is a non-adversarial proceeding, which requires the ALJ to fully and fairly develop the record. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). But while the duty to fully develop the record may include the obligation to recontact a treating physician for clarification of an opinion, "that duty arises only if a crucial issue is undeveloped." Id. Under the Code of Federal Regulations, the ALJ will recontact a medical source only where the evidence from a treating physician is inadequate to reach a decision. 20 C.F.R. § 404.1512(e); Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005). "We will seek additional evidence or clarification from your medical source when the [source's] report . . . contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable . . . techniques." 20 C.F.R. § 404.1512(e). The duty to recontact a medical source is triggered when the evidence is insufficient to make an informed determination – not when the evidence is insufficient to make a favorable determination. Pearson v. Barnhart, No. 1:04-CV-300, 2005 WL 1397049, at *4 (E.D. Tex. May 23, 2005).

Watson argues the ALJ should have recontacted her treating physician, but does not specify exactly which treating physician is at issue. In addition, she does not detail which issues she believes

remain undeveloped.  In his opinion, the ALJ does not state that the evidence at hand is insufficient to make an informed decision.  On the contrary, the ALJ described several medical visits during which Watson was found to have normal motor strength, normal sensory ability, mild or minimal degeneration in the knees and back, normal reflexes, and no serious mental limitations.  Indeed, the record is over 500 pages long, includes medical visits running from January 2002 to February 2007, and includes testimony from a range of sources, including a vocational expert.  There is no evidence that a crucial issue was undeveloped or that the evidence was insufficient to make an informed determination. The ALJ did not err by failing to recontact a treating physician.

## **VI.  CONCLUSION**

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).  The parties are advised that they have ten days to file written objections to this Report and Recommendation.  The failure to file timely written objections may waive the right to appeal issues of fact.


_____/S/    David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**


Signed on June 22, 2009.